# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 3:18-cr-173 |
| Plaintiff, | : | Judge Thomas M. Rose |
| v. | : | |
| RASU TAYLOR, | : | |
| Defendant. | : | |

## ENTRY AND ORDER DENYING MOTION TO SUPPRESS (DOC. 18)

This case is before the Court on the Motion to Suppress (Doc. 18) filed by Defendant Rasu Lee Taylor ("Taylor"). On November 27, 2018, the Grand Jury returned a two-count indictment against Taylor. (Doc. 3.) Count 1 alleges a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) & 924(a)(2). Count 2 alleges possession with intent to distribute a mixture or substance containing a detectable amount of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B). Taylor entered not guilty pleas to both counts. (Doc. 13.)

On January 9, 2019, Taylor filed the Motion to Suppress. (Doc. 18.) He seeks suppression of all tangible evidence seized by the Government and any statements that he allegedly made. (*Id*.) On March 19, 2019, the Court held a hearing on the Motion to Suppress. (Doc. 23.) On April 24, 2019, Taylor filed a Brief in Support of the Motion to Suppress. (Doc. 26.) On May 15, 2019, the Government filed a Response in Opposition to the Motion to Suppress. (Doc. 27.) On May 28, 2019, Taylor filed a Reply Brief in Support of the Motion to Suppress. (Doc. 28.) This matter is therefore ripe for review.

For the reasons below, the Motion to Suppress is **DENIED**.

## I. FACTUAL FINDINGS

The following findings are made based on the evidence submitted by the parties and the testimony at the March 19, 2019 hearing on the Motion to Suppress.

On September 17, 2018, detectives with the Clark County Sheriff's Office, including Detective Jonathan Snyder ("Detective Snyder"), were on patrol in an unmarked vehicle looking for individuals who had outstanding warrants. (Doc. 25 at PAGEID # 60-61, 63-64.) One of the individuals they were looking for was Ashonti Cherry ("Cherry"). (*Id.*) Detective Snyder believed that Cherry might be present at 132 West Euclid in Springfield, Ohio, based on information that the detectives had acquired from a reliable confidential informant and an earlier controlled buy of drugs from Cherry at that location. (*Id.* at PAGEID # 65-66, 77-78.) Detective Snyder knew what Cherry looked like from a description and a picture (or pictures) on the Ohio Law Enforcement Gateway (OHLEG), but he had not previously interacted with Cherry. (*Id.* at PAGEID # 69, 79-80.)

That same day, Detective Snyder and another detective observed an unoccupied greenish-colored Buick vehicle parked directly outside the front door of 132 West Euclid. (*Id.* at PAGEID # 66-67.) They drove past the address again approximately 30 to 45 minutes later, and this time they observed a man in the driver's seat of the parked Buick. (*Id.* at PAGEID # 67-68, 70, 80.) Detective Snyder had a clear, unobstructed view of the man, through the tinted windows of the detectives' vehicle, as they drove past the Buick. (*Id.* at PAGEID # 68.) Based on his observation of the man through the vehicle's windows for approximately five to eight seconds, Detective Snyder believed that Cherry was in the driver's seat of the Buick. (*Id.* at PAGEID # 69, 82.) The other detective in Detective Snyder's car made similar observations. (*Id.* at PAGEID # 82.)

The detectives watched the Buick pull away, followed it, and confirmed that the warrant for Cherry's arrest was still active. (*Id*. at PAGEID # 70-71, 76-77, 115.) The detectives contacted Deputy Christopher Doolin ("Deputy Doolin"), who was operating a marked law enforcement vehicle, and asked him to make a stop of the Buick. (*Id*. at PAGEID # 61, 73, 92, 94.) The detectives advised Deputy Doolin that Cherry was in the Buick and provided Deputy Doolin with a description of the Buick and its license plate number. (*Id*. at PAGEID # 94-95, 111.) Deputy Doolin was aware that Cherry had an outstanding warrant for his arrest, but was unfamiliar with Cherry and did not know what he looked like. (*Id*. at PAGEID # 96, 115.) Deputy Doolin was also unfamiliar with Taylor. (*Id*. at PAGEID # 114.)

Deputy Doolin caught up to the Buick in the parking lot of a motel. (*Id*. at PAGEID # 97, 101.) He stopped the Buick, ran the license plate that the detectives had provided, got out of his marked cruiser, and approached the vehicle. (*Id*.) As the Buick's driver (who turned out to be Taylor) was handing Deputy Doolin his driver's license, Deputy Doolin observed what he believed to be an open container of alcohol in the Buick (specifically, an open, clear beer bottle in or near the vehicle's center console with some golden-colored liquid remaining in it). (*Id*. at PAGEID # 102, 109, 113; Govt. Exh. 2.) Deputy Doolin asked the driver "What we drinking," to which the driver responded "A Modelo, beer" and held the bottle up. (Govt. Exh. 2; Doc. 25 at PAGEID # 100-102, 109, 112.)

After Deputy Doolin saw what he believed to be an open container of alcohol in the Buick, he looked at the driver's license that the driver (Taylor) provided. (Doc. 25 at PAGEID # 102.) It identified the driver as someone other than Cherry. (*Id*.) The driver (Taylor) told Deputy Doolin that the Buick was registered in his own name.[1] (*Id.*) Deputy Doolin recalled that, when he had

---

[1] Both Detective Snyder and Deputy Doolin testified that, in their experience, it is common for an individual to be driving a vehicle that is not registered to that individual. (Doc. 25 at PAGEID # 85, 104.)

3

run the license plate number, the information said "inmate progression"—meaning that the registered owner was either on parole or probation. (*Id*.) Taylor informed Deputy Doolin that he was on parole, specifically for aggravated robbery. (*Id.*)

Taylor gave evasive answers when Deputy Doolin asked him about getting out of the Buick or if Deputy Doolin could search the Buick. (*Id.*) Deputy Doolin then told Taylor to get out of the vehicle. (*Id.*) After asking Taylor to exit the Buick, Deputy Doolin believed that Taylor was attempting to conceal something. (*Id*. at PAGEID # 103.) Taylor then reached behind his back and began to pull something out of his rear pocket area; Deputy Doolin believed that something was a gun. (*Id*.) Deputy Doolin then pulled out his own gun and told Taylor to show his hands, and Taylor dropped something under a seat of the Buick (which, in fact, turned out to be a gun). (*Id*. at PAGEID # 103-04.) The Buick was searched, resulting in narcotics and a gun being found in the vehicle. (*Id*. at PAGEID # 75-76, 107, 109.)

## II. ANALYSIS

Taylor makes two arguments in support of his Motion to Suppress. First, he argues that the Court should suppress all evidence seized in the case as "fruit of the poisonous tree" because the stop was unlawful given the allegedly unreasonable mistake in initially identifying him as Cherry. (Doc. 26 at PAGEID # 118-121.) Second, Taylor argues that the Court should suppress all of the evidence seized because Deputy Doolin improperly prolonged his detention. (*Id*. at PAGEID # 121.)

### A. Fourth Amendment Protections

The Fourth Amendment to the United States Constitution prohibits "'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). "[T]he Fourth Amendment is satisfied if

the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *Id*. (internal quotation marks omitted). "An investigatory stop of an individual by a law enforcement officer is proper so long as there is a reasonable basis for the stop." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010). "An officer can stop and briefly detain a person when the officer has reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity." *Id*. (internal quotation marks and emphasis omitted).

In making a "reasonable suspicion" determination, a court "must look at the totality of the circumstances." *Arvizu*, 534 U.S. at 273. "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id*. at 274 (internal citations and quotation marks omitted). "[T]he officer must be able to articulate some minimal level of objective justification for making the stop, based upon specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Smith*, 594 F.3d at 537. "This process serves to balance the individual's interest in personal security with the government's interest in preventing ongoing or future criminal activity, solving past crimes, and bringing offenders to justice." *Id*.

"An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Perez*, 440 F.3d 363, 372 (6th Cir. 2006). "The investigative means used should also be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." *Id*. However, "[t]he Supreme Court has rejected a rigid time limitation on the lawfulness of a *Terry* stop, and emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id*. (internal quotation marks omitted). "To

assess whether a detention was too long to be justified as an investigative stop, courts should examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id*.

In the context of a motion to suppress, the party seeking suppression of evidence has the burden of establishing that the evidence was secured by an unlawful search. *United States v. Blakeney*, 942 F.2d 1001, 1015 (6th Cir. 1991).

**B. The Stop, Detention of Taylor, and Search of the Buick were Lawful**

Taylor argues that he was stopped for no justifiable reason. The Court disagrees. Government Exhibit 1 includes two pictures: one of Cherry and one of Taylor. As Detective Snyder testified, the pictures show similarities in the appearance of the two men, including in race, facial hair, baldness, and glasses. (Doc. 25 at PAGEID # 69-70, 83, 116; Govt. Exh. 1.) Although there are some differences in their appearances (*see* Doc. 25 at PAGEID # 82-83, 85, 87-88), it is not unreasonable that one of them would be mistaken for the other. Based on their resemblance and the information known to the detectives at the time (including the information provided by the confidential informant and that, in the recent past, Cherry sold drugs at 132 W. Euclid – directly behind where the Buick had been parked), it was reasonable for them to believe that Cherry was the driver of the Buick and to mistake Taylor for Cherry. There was sufficient probability that Cherry, a person with an outstanding warrant for his arrest, was operating the Buick.

The Supreme Court has held that "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill v. California*, 401 U.S. 797, 802 (1971). *Accord*: *King v. United States*, 917 F.3d 409, 422-23 (6th Cir. 2019). The same principle from *Hill* holds true where the police reasonably mistake a second party for the first party in the context of an investigatory stop.

6

*United States v. Patrick*, 776 F.3d 951, 954-56 (8th Cir. 2015); *United States v. Rosario*, 305 F. App'x 882, 885 (3rd Cir. 2009). For example, in *Patrick*, the officers suspected one person of a crime and reasonably believed that he was driving the car at issue. 776 F.3d at 956. However, it turned out that he was not the driver, i.e., the officers had made a mistake in the identity of the driver. *Id*. The Eighth Circuit held that, at the time that the officer made the stop, reasonable suspicion "existed to believe the driver had committed a crime. This is more than enough to justify a stop." *Id*. at 956. Similarly, the Third Circuit in *Rosario* found that, at the time of the directed stop, the officer had probable cause to believe that a valid arrest warrant existed for a certain person suspected of a crime, that the certain person was in the vehicle at issue, and that the certain person and the defendant were the same person. 305 F. App'x at 885. The Court held that "[t]his alone was sufficient to establish probable cause to support the directed stop of [the defendant's] vehicle," despite the officer ultimately being mistaken in the defendant's identity. *Id*.

Thus, here, the fact that the detectives were reasonably mistaken in whether Cherry was the man in the Buick does not negate that reasonable suspicion existed to stop the Buick. Deputy Doolin had a reasonable basis to make the stop. *Smith*, 594 F.3d at 536. The detectives had provided Deputy Doolin with information that the driver was Cherry, and Deputy Doolin knew that Cherry had an outstanding warrant. Deputy Doolin had a reasonable, articulable suspicion that the driver of the Buick had been engaged in criminal activity and had an outstanding warrant for his arrest. *Id*.; *Patrick*, 776 F.3d at 954-56; *Rosario*, 305 F. App'x at 885. The stop was objectively justified given the totality of circumstances. *Smith*, 594 F.3d at 537.

Taylor points out that the officers admit that Taylor did not commit any visible traffic infraction to justify the traffic stop of Taylor's vehicle. (Doc. 26 at PAGEID # 118.) However, that does not change the outcome here. See, e.g., *Rosario*, 305 F. App'x at 885 (the warrant gave

7

the officer probable cause to stop the vehicle of the defendant, even if no traffic offense had occurred and the officer was mistaken that the warrant was for the defendant). Additionally, the evidence set forth above and presented at the hearing substantiates the Government's position that this case involved a mistaken identity, not a story fabricated after the fact to substantiate the stop.

The detention of Taylor and subsequent search of the Buick were also lawful. In *United States v. Batten*, 73 F. App'x 831, 833 (6th Cir. 2003), the Sixth Circuit first found that officers had a reasonable basis to stop the vehicle being driven by the defendant. The Court then held that the officers had probable cause to search both the vehicle and the defendant where, while investigating a potential violation of the law, an officer "discovered an open container of beer inside the truck." After the defendant "was arrested and placed in the police car, [the officer] returned to the spot near the truck bed where [the defendant] had been standing and found a bag with a gun in it." *Id*. The Sixth Circuit determined that the officers "clearly had probable cause to suspect that [the defendant] was engaged in criminal activity." *Id*. *Accord*: *Rosario*, 305 F. App'x at 885 ("[a]s the stop of the vehicle and subsequent arrest were supported by probable cause, the weapon found during the search of [the defendant's] person incident to the lawful arrest was correctly deemed admissible.").

Similarly, Deputy Doolin's initial investigative detention did not last longer than was necessary for the stop's purpose. *Perez*, 440 F.3d at 372. Prior to Deputy Doolin learning the true identity of the Buick's driver, he observed what he believed to be an open container of alcohol in the vehicle—a violation of law. *See* O.R.C. § 4301.62(B)(4), (5) (prohibiting open container of beer or intoxicating liquor in a motor vehicle). This justified detaining Taylor for a longer period of time than the initial stop's purpose of confirming that the driver of the Buick was Cherry and arresting Cherry. Deputy Doolin now was investigating a potential violation of law by Taylor,

8

with the additional possibility that Taylor could be impaired to drive. Based on the facts set forth above, Deputy Doolin had probable cause to ask Taylor to get out of the Buick and then to search the Buick. See *Batten*, 73 F. App'x at 833. The search was lawful, and the tangible evidence seized by the Government during the search of the Buick, including the gun, are admissible. *Id*; *Rosario*, 305 F. App'x at 885.

### III. CONCLUSION

For the reasons above, the Court **DENIES** Taylor's Motion to Suppress (Doc. 18).

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, May 31, 2019.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE